UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

      v.                                        **DECISION AND ORDER**
                                                          00-CR-54-RJA

PERFECTO RICHIEZ-CASTILLO,

                      Defendant.
_____

       Currently before the Court is Defendant Perfecto Richiez-Castillo's *pro se* motion (Dkt. No. 921) for an order reducing his sentence to time served and releasing him to home confinement, pursuant to 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, and based on the current COVID-19 pandemic.  The Government has filed opposition papers (Dkt. No. 923), as well as a supplemental response (Dkt. No. 924).  Defendant was invited to submit a reply (Dkt. No. 922), but he did not.  For the reasons stated below, and particularly because the increased risks to Defendant's health do not outweigh the need for his sentence of imprisonment, the Court denies Defendant's motion for compassionate release.

## **BACKGROUND**

       After pleading guilty to violating 21 U.S.C. § 848(a) (engaging in a continuing criminal enterprise) and 18 U.S.C. § 1956(h) (conspiracy to commit money laundering), Defendant was sentenced on September 19, 2003 to 360 months and 240 months of incarceration, respectively, to be served concurrently, to be followed by 3 years of supervised release as to each count, to be served concurrently.  (*See* Dkt. No. 665 [Amended Judgment]; Dkt. No. 628 [CM/ECF Minute Entry, 9/19/2003]).  The top

conviction carried a 20-year mandatory minimum term of imprisonment.  Defendant is currently housed at McRae Correctional Institution ("CI McRae") and he has a projected release date of October 15, 2025.[1]

Defendant, who is 56 years old, claims that he is particularly vulnerable to severe illness or death from the virus because of several medical conditions, and the conditions of his confinement unreasonably expose him to the risk of contracting the virus. Certainly, the COVID-19 pandemic has resulted in a global public health crisis and national emergency.  "[T]he question of whether compassionate release is warranted during the pandemic remains a dynamic and fact-intensive inquiry."  *United States v. Franco*, 12-CR-932, 2020 U.S. Dist. LEXIS 111169, *2-3 (S.D.N.Y. June 24, 2020).

## DISCUSSION

Preliminarily, Defendant seeks "early release" from his term of imprisonment based on the compassionate release statute, but he also cites several other statutes. (*See* Dkt. No. 921, pp. 1-2).  As to those statutes, "[n]either the Second Chance Act, the First Step Act, nor the CARES Act give district courts authority to determine a prisoner's placement; they 'merely give eligible inmates the possibility to be considered [by the BOP] for home confinement or halfway house placement.'"  *United States v. Fairbanks*, 2021 U.S. Dist. LEXIS 37798, *3 (W.D.N.Y. Feb. 27, 2021) (internal citation omitted). Accordingly, the Court shall only address Defendant's motion as a request for a modification of his sentence pursuant to the First Step Act.  18 U.S.C. § 3582(c)(1)(A)(i).

---

[1] *See* Federal Bureau of Prisons, "Inmate Locator", https://www.bop.gov/inmateloc/ (last visited May 4, 2021).

Under the compassionate release statute, the Court may "reduce the term of imprisonment and impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." 18 U.S.C. § 3582(c)(1)(A). It is a defendant's burden to show that he or she is "entitled to a sentence reduction under the [compassionate release] statute." *United States v. Korn*, 15-CR-81S; 11-CR-384S, 2020 U.S. Dist. LEXIS 62771, *4 (W.D.N.Y. Apr. 9, 2020).

Relief is proper pursuant to 18 U.S.C. § 3582(c)(1)(A) when the following conditions are met: (1) the defendant has satisfied the statutory exhaustion requirement; (2) the Court finds that "extraordinary and compelling reasons" warrant a reduction of the prison sentence; (3) the reduction is consistent with the corresponding policy statements issued by the Sentencing Commission (*see* U.S.S.G. § 1B1.13); and (4) the sentencing factors set forth in 18 U.S.C. § 3553(a) support modification of the prison term, including whether the defendant is a danger to the safety of any other person or the community. *See United States v. Poncedeleon*, No. 18-CR-6094, 2020 U.S. Dist. LEXIS 106890, *1-2 (W.D.N.Y. June 18, 2020).

In considering these elements and factors, "[d]istrict courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Tagliaferri*, No. 13-CR-115, 2019 U.S. Dist. LEXIS 205103, *8 (S.D.N.Y. Nov. 25, 2019).

I.   **Exhaustion of Administrative Remedies**

A motion under the compassionate release statute may be made by either the Bureau of Prisons ("BOP") or the defendant, but if it is the latter, only "after the

defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i).

The Government does not dispute that Defendant has satisfied the exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A). (*See* Dkt. No. 923, p. 5). Attached to Defendant's motion is his November 17, 2020 request for compassionate release based on several medical conditions in the context of the COVID-19 pandemic (*see* Dkt. No. 921, p. 22), and the Warden's December 21, 2020 denial (*see* Dkt. No. 921, pp. 23-24). More than 30 days have elapsed between the Warden's receipt of Defendant's request and Defendant's filing of the instant motion. As such, the Court concludes that Defendant has met the statutory exhaustion requirement.

## II.     Extraordinary and Compelling Circumstances

The Second Circuit has agreed with the majority position of "district courts across the country" that "the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances." *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020). Indeed, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *Id.* at 237-238 (emphasis in original), quoting 28 U.S.C. § 994(t).

Defendant argues that his medical conditions and the "new spike" of COVID-19 cases and mutations of the virus constitutes an "extraordinary and compelling" reason for compassionate release while he is incarcerated at CI McRae and subject to the

4

conditions therein.  He also asserts that he has served a long term of incarceration and that his prison conduct has been exemplary.

*Alleged Medical Issues*

Defendant argues that he has the following conditions, which pose a heightened risk of severe illness or death were he to contract COVID-19:  (1) "active pulmonary tuberculosis virus", (2) high blood pressure, (3) high cholesterol, and (4) "heritage health factors that [he] can develop".  Defendant attaches a copy of select medical records from CI McRae.  (*See* Dkt. No. 921, pp. 31-71).  The Court has also considered a heart rhythm condition that Defendant does not allege as high-risk with respect to COVID-19 but is reflected in the record.  For reasons that follow, the Court concludes after a review of Defendant's medical records that they do not reveal any extraordinary and compelling reasons justifying a sentence reduction.

1) *Tuberculosis*

Tuberculosis is "a potentially serious infectious disease that mainly affects the lungs."[2]  In a latent infection, bacteria in the person's body are "inactive and cause no symptoms", and the person is not contagious.  Latent tuberculosis can turn into active tuberculosis, which includes signs and symptoms like "[c]oughing for three or more weeks"; "[c]oughing up blood or mucus";  "[c]hest pain, or pain with breathing or coughing"; "[u]nintentional weight loss"; "[f]atigue"; "[f]ever"; "[n]ight sweats"; "[c]hills"; and "[l]oss of appetite".  "People with active tuberculosis must take many types of medications for months to get rid of the infection and prevent antibiotic resistance."[3]  In

---

[2] *See* Mayo Clinic, "Tuberculosis:  Symptoms & causes", https://www.mayoclinic.org/diseases-conditions/tuberculosis/symptoms-causes/syc-20351250 (last visited May 4, 2021).

[3] *Id.*

5

diagnosing tuberculosis, "[a] positive TB skin test or TB blood test only tells that a person has been infected with TB bacteria. It does not tell whether the person has latent TB infection (LTBI) or has progressed to TB disease. Other tests, such as a chest x-ray and a sample of sputum, are needed to see whether the person has TB disease."[4]

The medical records submitted by Defendant mention tuberculosis only twice. They do not support Defendant's assertion that he has active tuberculosis and are unclear whether he has latent tuberculosis. First, "[s]creening examination for pulmonary tuberculosis" is listed as one of Defendant's health problems. (*See* Dkt. No. 921, p. 32). Second, on a "Preventative Health Risk Assessment Tool" that was updated in March 2019 and is dated March 18, 2020, "No" is indicated under the category of Tuberculosis and next to the notation "Tuberculosis skin test (+)". (*See* Dkt. No. 921, pp. 53, 57). Defendant's presentence investigation report from 2003 ("PSR") states that Defendant's medical records indicated a positive PPD test suggesting tuberculosis, but that a subsequent chest examination was negative for that condition. (*See* Dkt. No. 925, ¶ 78).

Thus, from the PSR it appears that Defendant was previously infected with tuberculosis bacteria but in 2003 it was confirmed that he did not have an active infection. While incarcerated, a skin test for tuberculosis was negative and he was screened for tuberculosis (it is unclear if this listed "problem" is merely referring to his history of a skin test or a more recent test). The medical records otherwise contain no

---

[4] *See* Centers for Disease Control and Prevention, "Tuberculosis (TB): Testing & Diagnosis", https://www.cdc.gov/tb/topic/testing/default.htm (last visited May 4, 2021).

information or diagnosis with respect to tuberculosis, active or latent.  No signs and symptoms related to active tuberculosis appear to be in the records, and Defendant does seem to be on any medication regimen to treat an active infection.

Even if Defendant's one positive PPD test in 2003 is enough to prove that Defendant currently has latent tuberculosis (and the Court cannot make this conclusion), the CDC does not recognize latent or even active tuberculosis as a condition that increases an individual's risk of severe illness from COVID-19.[5] Moreover, it appears that courts are divided on whether a latent tuberculosis infection, "absent some other risk factor", constitutes an extraordinary and compelling reason during the pandemic.  *United States v. Delorbe-Luna*, 2020 U.S. Dist. LEXIS 230268 *3-4 (S.D.N.Y. Dec. 7, 2020).  The Court concludes that because "the record remains unclear as to whether Defendant even has latent tuberculosis; the medical records only suggest that he 'may' have it . . . the Court is not persuaded that [his health issues] are sufficiently extraordinary and compelling" to warrant early release.  *United States v. Cleveland*, 2020 U.S. Dist. LEXIS 174932, *5, 7-9 (W.D.N.Y. Sept. 23, 2020).

    2)  *High Blood Pressure and High Cholesterol*

Defendant does appear to have high blood pressure, which is monitored and routinely checked.  Although less clear from the records, he may have high cholesterol as well.  High cholesterol is not recognized by the CDC as a COVID-19 risk factor, while

---

[5] *See* Centers for Disease Control and Prevention ("CDC"), "COVID-19: People with Certain Medical Conditions", https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Apr. 29, 2021).

high blood pressure "*possibly* . . . can make you more likely to get severely ill from COVID-19."[6]

      3)  *Long QT Syndrome (LQTS)*

One medical condition that Defendant does not mention in his motion, but which he argued in his administrative request for compassionate release to the Warden, is "long QT", which he described as a "serious heart condition . . . that causes my heart to stop for second where I passed out in 2017; before it starts beating again my heart skips beats that causes damage to my brain because of a lack of oxygen, and because of that I am prescribe[d] medication for life."  (*See* Dkt. No. 921, p. 22).

"Long QT syndrome (LQTS) is a heart rhythm condition that can potentially cause fast, chaotic heartbeats.  These rapid heartbeats might trigger you to suddenly faint.  Some people with the condition have seizures.  In some severe cases, LQTS can cause sudden death . . . Long QT syndrome is treatable.  You might need to avoid or take certain medications to prevent dangerous heartbeat episodes.  Sometimes, treatment for long QT syndrome involves surgery or an implantable device."[7]

Defendant's medical records list "Prolonged QT interval" as a health problem of his.  (*See* Dkt. No. 921, p. 32; *see also* pp. 59, 65, 67, 68 [EKG "abnormal findings" of "QTc: 453"]).  He has had follow-up appointments at the Chronic Care Clinic for cardiac issues, and it appears EKGs are performed regularly.  Defendant has been consistently prescribed one medication as reflected in the medical records, *i.e.* Propranolol, which can be used to treat high blood pressure, irregular heartbeats, and other conditions.  It

---

[6] *Id.*

[7] *See* Mayo Clinic, "Long QT syndrome: Symptoms & causes", https://www.mayoclinic.org/diseases-conditions/long-qt-syndrome/symptoms-causes/syc-20352518 (last visited May 4, 2021).

is unclear if the Propranolol is for his high blood pressure, "prolonged QT interval", or both.

The Court has not been able to locate any case law in the Second Circuit or out-of-Circuit that discusses long QT syndrome in the context of a compassionate release motion. Defendant does not assert this condition as a basis for his motion or supply any material for the Court to conclude that long QT syndrome may be linked to severe COVID-19 illness, and it does not appear the CDC considers long QT syndrome as a COVID-19 high-risk condition.

The Court concludes that Defendant's alleged medical conditions in the context of the pandemic do not constitute an "extraordinary and compelling reason" for compassionate release.

<u>Conditions at CI McRae</u>

CI McRae is a contracted correctional institution, operated by a private corporation, and is in McRae Helena, Georgia.[8]

Defendant argues that there had been a "new spike" of COVID-19 at CI McRae, with several inmates and staff members who were contagious. He further argues that he has not been administered a single COVID-19 test because, according to him, CI McRae does not follow BOP policies. Moreover, Defendant asserts that he has been on lockdown for over 10 months, housed in his quarters except for an hour of recreation three times per week. Defendant generally argues that COVID-19 infection rates are 6.5 times higher for inmates than the general United States population, and courts have recognized BOP's inability to control the pandemic as evidenced by the many inmates

---

[8] *See* Federal Bureau of Prisons, "CI MCRAE", https://www.bop.gov/locations/ci/mca/ (last visited May 4, 2021).

9

who have been infected so far.  He also points to the number of documented cases and deaths from COVID-19 in Georgia, where his facility is located.

The Government argues that Defendant's limited mobility within CI McRae counters Defendant's claim that CI McRae is not following COVID-19 protocols.  The Government represents that it verified "several of the steps that contract prisons have taken to stop the spread of COVID-19".  (*See* Dkt. No. 923, p. 3).  It also notes that the facility has had a relatively small number of confirmed positive cases of the virus and had no active cases as of February 23, 2021.

The Court cannot conclude on this record that Defendant's conditions of confinement constitute an extraordinary and compelling reason for a reduction in sentence.  CI McRae has 1,508 total inmates, and as of the date of this ruling according to the BOP, the facility has 0 inmates with confirmed active cases of the virus and 0 staff.  To date, 30 inmates have recovered from the virus and 1 inmate has died.[9]  The Court is aware that these numbers may not account for asymptomatic transmission of the virus.  However, many BOP facilities have coped with outbreaks and have experienced much higher positive case counts than CI McRae.

Recognizing the challenge that the pandemic poses to prisons and the measures that CI McRae is apparently taking to cope with any positive cases, the Court concludes that the conditions at CI McRae are not so dangerous as to present an extraordinary and compelling reason for a reduction in sentence.

---

[9] *See* "COVID-19: Coronavirus: COVID-19 Cases", Federal Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited May 4, 2021); *see also* Federal Bureau of Prisons, "CI MCRAE", https://www.bop.gov/locations/ci/mca/ (last visited May 4, 2021).

*COVID-19 Vaccination*

In relation to his conditions of confinement, Defendant argues that it is impossible to control COVID-19 in the prison setting and mass vaccination could take the United States until into 2022 to accomplish. He argues that inmates who were listed by the BOP as having "recovered" from the virus are being infected a second time and dying in BOP custody, as it is estimated that antibodies from a natural infection of COVID-19 last only for a period of 4 to 6 months.

The Government has filed a supplemental response to the motion, attaching a page from Defendant's CI McRae medical records documenting that Defendant was offered the COVID-19 vaccine and declined to receive it on April 12, 2021. (*See* Dkt. No. 924-1). The Government argues that Defendant's "refusal to be vaccinated underscores why 'extraordinary and compelling reasons' do not exist in this case." (*See* Dkt. No. 924, p. 1).

It is of course within an inmate's rights to refuse any medical treatment, including vaccination. However, courts may consider a defendant's declination of a COVID-19 vaccine as part of their "extraordinary and compelling" reasons analysis where a defendant argues his or her health is compromised while incarcerated during the pandemic, due to certain high-risk medical conditions. *See e.g. United States v. Colon*, 2021 U.S. Dist. LEXIS 65886 *9 (W.D.N.Y. Apr. 5, 2021) ("Defendant's decision not to accept a vaccine appears to undermine the legitimacy of his concerns about COVID-19."); *United States v. Intyre*, 2021 U.S. Dist. LEXIS 50310 *4 (W.D.N.Y. Mar. 17, 2021) ("it is not apparent why [the defendant] refused to take the vaccine if he was truly concerned that his health might be compromised at the institution"); *United States v.*

11

*Mack*, 2021 U.S. Dist. LEXIS 29214 *4 (W.D.N.Y. Feb. 17, 2021) (considering records that "demonstrate[d] [the defendant]'s refusal to accept the vaccine").

### Prison Conduct

The Court may not consider rehabilitation in and of itself as an extraordinary and compelling reason (*see Brooker*, 976 F.3d at 237-238). Because the Court has concluded that neither Defendant's medical conditions nor the conditions of his confinement in the framework of the COVID-19 pandemic qualify as "extraordinary and compelling reasons" for compassionate release, the Court may not conclude that Defendant's alleged conduct over the past 21 years and professed rehabilitation satisfies this statutory requirement. These arguments are analyzed in the discussion of the 18 U.S.C. § 3553(a) factors below, however.

In sum, Defendant has not met his burden of proving extraordinary and compelling circumstances for a reduction in sentence, as to his medical conditions or the conditions at CI McRae during the COVID-19 pandemic. In addition, Defendant's refusal of the COVID-19 vaccine further militates against granting Defendant's motion.

### III.    18 U.S.C. § 3553(a) Factors and Dangerousness

The Government argues that Defendant's motion for release should be denied because the § 3553(a) factors do not weigh in favor of release, and because Defendant presents a danger to others and the community.[10] In contrast, Defendant argues that his criminal history and actions for the past 20 years weigh against further incarceration.

---

[10] The § 3553(a) factors include the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training and treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a).

Regarding the instant offense conduct, Defendant played a key managerial role in a large cocaine trafficking organization, which was responsible for distributing approximately 25 kilograms of cocaine monthly between 1999 and March 2000.  The organization's source of supply was in Houston, Texas and cocaine and money were moved by using vehicles with hidden compartments for transportation to Rochester, New York.  The cocaine was then distributed to customers in the Rochester, Buffalo, and Niagara Falls, New York regions.  (*See* Dkt. No. 925 [PSR], ¶¶ 6-17 [Offense Conduct]).

Moreover, Defendant was assessed as a Career Offender under the Federal Sentencing Guidelines at the time of sentencing due to three prior felony convictions for narcotics offenses that he had sustained.  At the time of Defendant's sentencing, he had three active warrants pending in three jurisdictions.  He absconded prior to sentencing relative to one drug felony, and other warrants were issued for his failure to appear for court proceedings and his violation of parole.  Defendant committed the instant offense while on probation supervision.  Defendant additionally failed to appear for his deportation hearing, which is discussed further below.  (*See* Dkt. No. 925 [PSR], ¶¶ 29, 45-49).

The Court concludes that early release to home incarceration is not justified, considering Defendant's offense conduct, criminal history, and his record of poor compliance with conditions of Court supervision, even though Defendant has served a majority of his term of incarceration.  According to the Sentencing Monitoring Computation Data sheet attached to Defendant's motion, as of December 28, 2020, he had served 69.2% of his full term of incarceration and 81.2% of his statutory term.  (*See*

Dkt. No. 921, pp. 25-30.  It appears that, to date, he has served approximately 21 years for this criminal conviction.  The Court notes again, however, that the top Count of conviction alone carried a mandatory minimum sentence of 20 years of incarceration.

In its assessment of the instant motion, the Court has also considered Defendant's other arguments concerning his rehabilitation efforts.  Defendant argues that while incarcerated, he has been a "model inmate".  He cites zero disciplinary reports against him, 36 educational courses he has taken, and his involvement with church services and Bible study.  Defendant argues he has "changed completely through all this [sic] years of incarceration".  (*See* Dkt. No. 921, p. 7).  He attaches to his motion his Individualized Reentry Plan, which confirms he has "[m]aintained clear conduct and good work evaluations",[11] and that he completed 36 education courses as of July 30, 2020.  (*See* Dkt. No. 921, pp. 87-89).  The Government "does not dispute that [Defendant]'s conduct in prison appears to be commendable."  (Dkt. No. 923, p. 13).  Defendant appears to be using his time while incarcerated wisely.  However, on balance, Defendant's history, the seriousness of his offense conduct, and the other § 3553(a) factors, weigh against early release.

## IV.  Defendant's Immigration Status

Lastly, the Court has also considered the practical implications were Defendant to be released, considering his immigration status.  Defendant is a citizen of the Dominican Republic, and an order of deportation was entered in 1995 after he failed to appear for deportation hearing.  (*See* Dkt. No. 925 [PSR], p. 2 and ¶¶ 53, 76; Dkt. No. 921, p. 23 [the Warden, in denying Defendant's motion, noted, "You have an unresolved

---

[11] The Government has confirmed with the BOP that Defendant has no disciplinary record.

BICE detainer of deportation to the Dominican Republic."], p. 88 [Individualized Needs Plan, noting "Criminal alien releasing to custody of ICE" and "Detainers – B.I.C.E. detainer possible deportation to Dominican Republic."]).

The Government represents that both of Defendant's convictions make him an aggravated felon and thus subject to mandatory removal, and that if Defendant was to be released from CI McRae on this motion, "he would likely move into the custody of ICE" before any removal to the Dominican Republic. (Dkt. No. 923, pp. 10-11). The Government also notes that the CDC issued a "Level 4" travel advisory (the highest level on the scale) recommending against any travel to the Dominican Republic due to "Very High" levels of COVID-19 in the country and limited available medical care.[12]

Defendant's ICE detainer "does not militate against modifying his sentence. Courts . . . routinely grant compassionate release in cases involving defendants subject to ICE detainers." *United States v. Rojas*, 2020 U.S. Dist. LEXIS 238647, *10 (S.D.N.Y. Dec. 18, 2020) (collecting cases). Even so, "a court considering a Section 3582(c)(1)(A) motion where the defendant is subject to an immigration detainer will likely weigh the practical implications of any reduction in the sentence, given the risks inherent in transfer to a different facility or deportation." *United States v. Beras*, 2020 U.S. Dist. LEXIS 239679, *8 (S.D.N.Y. Dec. 21, 2020).

Defendant's release plan is that he be "immediately" deported to the Dominican Republic, where he would live in his mother's house and work remotely for a hair salon

---

[12] *See* Centers for Disease Control and Prevention, "COVID-19 in the Dominican Republic", https://wwwnc.cdc.gov/travel/notices/covid-4/coronavirus-dominican-republic (last visited May 4, 2021); U.S. Embassy in the Dominican Republic, "U.S. Citizen Services: Coronavirus Information for the Dominican Republic ", https://do.usembassy.gov/u-s-citizen-services/covid-19-information/ (last visited May 4, 2021) ("Medical care is limited, there is limited availability of ICU beds, and hospitalized patients may have an increased risk of exposure to COVID-19.").

15

or barbershop, and he names a type of medical insurance and health provider which he would allegedly have access to. He argues that his family will pay any costs related to his deportation. (*See* Dkt. No. 921, p. 10-11).

The Court cannot order ICE to permit Defendant's "immediate" voluntary deportation as he asks, or control where he is housed or for how long after he is placed in ICE custody due to the immigration detainer. Indeed, any reduction of Defendant's sentence "will likely result in transfer to immigration custody which may pose equal or greater health risks". *Beras*, 2020 U.S. Dist. LEXIS 239679, at *3. Also questionable is the viability of Defendant's release plan and whether a deportation to the Dominican Republic could place him at even greater risk of susceptibility to COVID-19 infection. As such, the Court concludes that the likely consequences of a reduction in Defendant's sentence work against the stated driving force in his filing of this motion.

## CONCLUSION

For the foregoing reasons, Defendant's motion for compassionate release (Dkt. No. 921) pursuant to 18 U.S.C. § 3582(c)(1)(A) is denied.

**IT IS SO ORDERED.**

      _s/Richard J. Arcara_
      HONORABLE RICHARD J. ARCARA
      UNITED STATES DISTRICT COURT

Dated: May 4, 2021
      Buffalo, New York